IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 07-00615 (07) SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING IN PART AND |
| vs. | ) | DENYING IN PART DEFENDANT WAYNE |
| | ) | KILA'S MOTION TO SUPPRESS |
| WAYNE KILA,  (07) | ) | EVIDENCE |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT WAYNE KILA'S MOTION TO SUPPRESS EVIDENCE

I.        INTRODUCTION.

Defendant Wayne Kila moves to suppress evidence obtained from the search of a white Toyota Celica he was driving at the time of his arrest, as well as evidence obtained from his residence pursuant to a search warrant issued based on an affidavit that cited evidence seized from the vehicle.  Kila argues that the search of the vehicle was not incident to arrest. Kila also seeks to suppress post-arrest statements that he allegedly made without being advised of his Miranda rights.  The Government claims that (1) the search of the vehicle was contemporaneous with Kila's arrest; (2) even if the search was not contemporaneous with the arrest, the search was valid under the automobile exception; (3) the search of the vehicle was a valid inventory search pursuant to Drug Enforcement Administration ("DEA") policy; (4) the search of Kila's home was valid because the warrant supported the search even if references

to evidence obtained or flowing from the search of the vehicle were excluded; and (5) the good-faith exception justified reliance on the search warrant.  With regard to Kila's Miranda challenge, the Government argues that, because Kila's statement was spontaneous and voluntary, no Miranda warnings were required.

The court concludes that (1) the search of Kila's vehicle was incident to arrest; (2) alternatively, probable cause supported the warrantless search and seizure of the vehicle under the automobile exception; (3) the search warrant of Kila's residence was supported by probable cause even excluding evidence obtained from the vehicle; (4) even if the search warrant was not supported by probable cause after evidence recovered from the car is excluded, the good-faith exception applies to justify reliance on the search warrant in searching Kila's residence; and (5) Kila's post-arrest statements were obtained in violation of his Miranda rights.  The court therefore grants in part and denies in part Kila's Motion to Suppress.

II.      FINDINGS OF FACT.

This court makes the following findings of fact, by a preponderance of the evidence.  The findings are set forth in numbered paragraphs for ease of future reference.

1.  This court has before it four exhibits submitted by Kila: (1) a map illustrating the route and distance from Kila's residence in Ewa Beach to the federal building located at

300 Ala Moana Boulevard in Honolulu, Hawaii ("Federal Building")
("Ex. 6"); (2) a map documenting the locations of the events that
occurred on the evening of November 27, 2007 ("Ex. 7");
(3) Kila's arrest warrant, issued on November 14, 2007 ("Ex. 8");
and (4) the Search Warrant for Kila's residence, dated November
28, 2007, with its accompanying application and affidavit ("Ex.
9").

       2.   This court held an evidentiary hearing, during
which it received oral testimony from Honolulu Police Department
("HPD") Officer Reuben Oh, retired DEA Task Force Officer ("TFO")
Joyce Alapa, DEA TFO Lawrence Peralta, and DEA TFO Richard
Worthington.  This court found Officer Oh and TFO Alapa credible
on the matters to which they testified.  Cross-examination of TFO
Peralta and TFO Worthington revealed some discrepancies in some
of the matters to which they testified, but they appeared to the
court to be attempting to be truthful and were not only credible
but also accurate as to most of the matters they testified to.

       3.   On November 14, 2007, a federal grand jury
indicted Kila for conspiracy to "distribute and possess, with
intent to distribute, 50 grams or more of methamphetamine."
Indictment at 2.  An arrest warrant issued that same day.  Ex. 8.

       4.   On November 26, 2007, TFO Peralta, the lead agent
in charge of Kila's arrest, confirmed with the United States
Postal Service that Kila's mailing address was in Ewa Beach,

Hawaii.  Transcript of Proceedings on the Motion to Suppress
Evidence (April 15, 2008) ("Tr.") at 47, 51.  TFO Peralta also
verified Kila's address by comparing it with a copy of Kila's
driver's license.  Id. at 47.  From other investigations and
Kila's criminal record, TFO Peralta knew that Kila had had
multiple drug arrests and prior felony drug convictions.  Id. 46-
47.

      5.  On the morning of November 27, 2007, DEA officers
monitored Kila at his Ewa Beach residence.  They saw a white
Toyota Celica parked near his home.  Id. at 49-50.  The vehicle
was registered to Kila's girlfriend, Elaine Kina.  Id. at 50.

      6.  At approximately 9:15 p.m., the white Toyota
Celica left the house, driven by someone TFO Worthington and his
partner, relying on photographs of Kila and a physical
description they had, believed to be Kila.  TFO Worthington
reported this to other officers over the radio.  Id. at 100-01.
Told by TFO Peralta to follow Kila, TFO Worthington and his
partner followed the white Toyota Celica onto the Moanalua
freeway heading eastbound.  Id. at 51, 101.

      7.  All the officers involved in the surveillance were
in unmarked vehicles.  Because HPD policy requires that arrests
be made with marked vehicles, TFO Peralta called in marked units
of the HPD Patrol and Traffic Division to have them stop and
arrest Kila.  Id. at 51.  Over the police radio, TFO Peralta

4

noted the make, license plate number, and location of the vehicle
to be pulled over.  Id. at 12, 52.  While calling for HPD
assistance, TFO Peralta, in a car with TFO Alapa, tried to follow
Kila, but eventually passed him because he was driving so slowly.
Id. at 54.

       8.  Two to four minutes after TFO Peralta's message
went out over the police radio, Officer Oh saw the vehicle near
the Ala Kapuna overpass.  Id. at 12.  Officer Oh was driving a
subsidized vehicle, which is a personal vehicle equipped with a
blue light on the roof and a siren.  At about 9:20 or 9:25 p.m.,
Officer Oh pulled over the white Toyota Celica on the Moanalua
Freeway, east of the Ala Kapuna overpass.  Id. at 13-14.

       9.  Officer Oh told Kila he was being pulled over for
a traffic offense and asked for Kila's license, registration, and
proof of insurance.  Instead of complying, Kila reached for his
keys and tried to restart the engine.  Officer Oh grabbed Kila's
arms.  Kila resisted for a couple of seconds until Lieutenant
Walter Ozeki arrived.  Lieutenant Ozeki and Officer Oh got Kila
out of the vehicle, and Lieutenant Ozeki placed Kila under
arrest.  Id. at 15-16, 19.  Lieutenant Ozeki, who was also the
Group Supervisor of the task force, had been in contact with TFO
Peralta and knew of the plans to arrest Kila.  Id. at 88.

       10.  At the time of Kila's arrest, TFO Peralta and TFO
Alapa were approximately 100 yards ahead of where Kila was

stopped.  Id. at 31.  TFO Peralta learned through the police
radio that Kila had been pulled over and confirmed the arrest
himself visually through his rearview mirror.  Id. at 55.  TFO
Peralta documented the time of the stop as 9:29 p.m. and the time
of Kila's arrest as 9:30 p.m.  Id. at 62.  TFO Peralta pulled
over to the right shoulder of the highway and reversed his
vehicle until he was forty to fifty feet in front of the Toyota
Celica.  Id. at 55-56.

         11.  TFO Peralta and TFO Alapa ran back to where Kila
had been arrested and saw Lieutenant Ozeki search Kila.  Id. at
32-33.  Lieutenant Ozeki handed Kila's wallet and cell phone to
TFO Alapa, and TFO Alapa opened the wallet to look for a driver's
license.  In the wallet, TFO Alapa found a small plastic ziplock
bag containing a white crystal-like substance.  TFO Alapa had
spent twenty-six years with HPD and eighteen years in drug
enforcement and believed the white substance was methamphetamine.
Id. at 34-35.

         12.  TFO Alapa told TFO Peralta about the substance
found in Kila's wallet.  Id. at 59.  TFO Peralta has been
employed by HPD for approximately seventeen and a half years and
has worked specifically in drug investigations for about six
years.  Id. at 43.  The substance found on Kila, Kila's past
arrests, and Kila's involvement as a distributor of

methamphetamine led TFO Peralta to think that additional drugs
would be found in the Toyota Celica.  Id. at 59-60.

13.  TFO Peralta told Kila that he was under arrest
for conspiracy to possess and distribute methamphetamine and that
he was facing a life sentence.  TFO Peralta then asked Kila
whether he wanted to cooperate with law enforcement.  Kila
responded that he did not want to cooperate and would "do the
time."  Id. at 56-57, 69.  No Miranda warnings were given.  Kila
was then placed in TFO Peralta's vehicle to be transported to the
Federal Building for processing.  Id. at 35.

14.  TFO Peralta had safety concerns about searching
the Toyota Celica on the right shoulder of the highway.  It was
night, there was, according to Officer Oh, "medium" traffic flow,
and cars tended to pick up speed when coming to the Ala Kapuna
overpass.  Id. at 14, 61.  When TFO Worthington arrived at the
scene, Kila was sitting in TFO Peralta's vehicle.  TFO
Worthington saw two or three police cars parked behind the Toyota
Celica, but only one car had its flashing lights on.  Id. 110-11.
TFO Peralta told TFO Worthington to drive the Toyota Celica to
the Federal Building and to search the vehicle there.  Id. at 63,
102, 110-11.

15.  Approximately ten minutes after Kila's arrest,
TFO Alapa and TFO Peralta drove Kila to the Federal Building.
Id. at 37, 61.  TFO Worthington drove the Toyota Celica to the

7

Federal Building.  Id. at 102, 111.  Although TFO Worthington was not entirely clear regarding how long he remained at the scene of arrest before leaving in the Toyota Celica, see id. at 102, he appeared to recollect having left not long after speaking with TFO Peralta, see id. at 102, 111, and after TFO Peralta had left the scene, id. at 63.

16.  It took TFO Worthington around fifteen minutes to drive the Toyota Celica about four miles from the Ala Kapuna overpass to the Federal Building.  Id. at 63, 103.  TFO Worthington made no stops on his way to the Federal Building and parked the Toyota Celica in the secure underground parking facility at the Federal Building.  Id. at 105-07.  TFO Peralta was notified when the Toyota Celica arrived at the Federal Building and documented the time of arrival as approximately 9:45 p.m.  Id. at 62.

17.  The evidence that Kila left the scene about ten minutes after his arrest at 9:30 p.m., the Toyota Celica left shortly after Kila left, and it took fifteen minutes to get from the Ala Kapuna overpass to the Federal Building, suggests that the Toyota Celica may have reached the Federal Building a little later than the time noted by TFO Peralta.  Possibly, the car arrived around 9:55 p.m.  Even that time was less than half an hour from Kila's arrest.

18.   Officer Worthington, along with other DEA
Officers, searched the Toyota Celica and found a backpack and a
cellular phone on the passenger seat, and another cellular phone
on the floor of the passenger seat.  Id. at 104.  The backpack
contained $34,620 in U.S. currency and three small ziplock bags
containing a white crystal-like substance.  Ex. 9 at 31-32.  All
the items were seized.

19.   DEA Officers conducted a field test on the
substance in the bags, which confirmed the presence of
methamphetamine.  Later laboratory tests also confirmed that the
bag found on Kila's body during his arrest contained .19 grams of
pure methamphetamine.  Id.

20.   On the afternoon of November 28, 2007, DEA
Officers obtained a search warrant for Kila's residence from
Magistrate Judge Barry Kurren.  Id. at 2.  The application for
the search warrant included a thirty-three-page affidavit
detailing the twenty-seven-month investigation into the
methamphetamine organization with which Kila was allegedly
involved.  See id.  Less than two pages of the affidavit
concerned items seized from Kila's Toyota Celica.  Id. at 31-32.

21.   That same day, DEA Officers searched Kila's home
pursuant to the search warrant.  They found a bag containing
$24,723 in U.S. currency, several ziplock plastic bags containing
a white crystal-like substance, a digital scale, and documents

with Kila's name and his home address.  DEA laboratory tests
later confirmed that the white substance recovered from the
ziplock bags was 34.9 grams of actual methamphetamine.

III.     CONCLUSIONS OF LAW.

         A.  The Search of the Toyota Celica was a
             Contemporaneous Search Incident To Arrest.

         1.  The Fourth Amendment protects the "right of the
people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures."  See United
States v. Place, 462 U.S. 696, 701 (1983).  The Fourth Amendment
generally requires police to secure a warrant before conducting a
search, California v. Carney, 471 U.S. 386, 390-91 (1985), as
searches conducted outside the judicial process, without prior
approval by a judge, are per se unreasonable under the Fourth
Amendment.  United States v. Ross, 456 U.S. 798, 825 (1982); Katz
v. United States, 389 U.S. 347, 357 (1967).

         2.  There are a few specifically established and
well-delineated exceptions to this warrant requirement.  See
United States v. Ross, 456 U.S. 798, 825 (1982); Katz v. United
States, 389 U.S. 347, 357 (1967).  A warrantless search of an
automobile, incident to arrest, is one of those exceptions.
"[W]hen a policeman has made a lawful custodial arrest of the
occupants of an automobile he may, as a contemporaneous incident
of that arrest, search the passenger compartment of that
automobile."  New York v. Belton, 453 U.S. 454, 460 (1981); see

10

also United States v. Smith, 389 F.3d 944, 951 (9th Cir. 2004).
During the search, the police may also examine the contents of
any container within reach of the arrestee. Belton, 452 U.S. at
460.

3.  The Supreme Court has upheld warrantless searches
incident to arrest because of the need to remove any weapon that
might pose a safety concern and the need to prevent the
concealment or destruction of evidence. Chimel v. California,
395 U.S. 752, 763 (1969); see also Smith, 389 F.3d at 951. The
Ninth Circuit has concluded, however, that a warrantless
automobile search incident to arrest "is a bright-line rule that
may be invoked regardless of whether the arresting officer has an
actual concern for safety or evidence." United States v.
McLaughlin, 170 F.3d 889, 891 (9th Cir. 1999). Thus, "the
applicability of the Belton rule does not depend upon a
defendant's ability to grab items in a car but rather upon
whether the search is roughly contemporaneous with the arrest."
Id. at 891-92; see also Smith, 389 F.3d at 1106 (noting that the
critical inquiry under the Belton rule is whether the search is
"roughly contemporaneous with the arrest").

4.  Kila contends that the warrantless search of the
Toyota Celica "was not roughly contemporaneous with [his] arrest,
and was so separated by time and by intervening acts that it
cannot be characterized as 'incident to arrest.'" Defendant's

11

Motion to Suppress Evidence (Feb. 7, 2008) ("Motion") at 6.  The
Government responds that the "short time lag is inherently
reasonable given the fact the officers needed to move the vehicle
from the shoulder of the busy Moanalua Freeway to a controlled
location where it could be safely searched."  United States of
America's Response and Opposition to Defendant Kila's Motion to
Suppress Evidence (Feb. 29, 2008) ("Opp'n") at 5.

     5.  A search may be contemporaneous even if arresting
officers do not conduct the search immediately after the arrest.
<u>Smith</u>, 389 F.3d at 951 ("[W]e have held that a search need not be
conducted immediately upon the heels of an arrest, but sometimes
may be conducted well after the arrest, so long as it occurs
during a continuous sequence of events.").  "[T]ime alone is
never dispositive of the contemporaneity inquiry."  <u>United States
v. Weaver</u>, 433 F.3d 1104, 1107 n.1 (9th Cir. 2006).  "There is no
fixed outer limit for the number of minutes that may pass between
an arrest and a valid, warrantless search that is a
contemporaneous incident of the arrest."  <u>McLaughlin</u>, 170 F.3d at
892.

     6.  Rather, a court examining whether a search is
contemporaneous with an arrest must determine whether the arrest
and search constituted "one continuous series of events closely
connected in time," <u>McLaughlin</u>, 170 F.3d at 893, and whether the
search was reasonable in light of the circumstances of the

arrest.  <u>Smith</u>, 389 F.3d at 951; <u>see also</u> <u>McLaughlin</u>, 170 F.3d at
893 ("The relevant distinction turns not upon the moment of
arrest versus the moment of the search but upon whether the
arrest and search are so separated in time or by intervening acts
that the latter cannot be said to have been incident to the
former.") (quoting <u>United States v. Abdul-Saboor</u>, 85 F.3d 664,
668 (D.C. Cir. 1996)).

      7.  In <u>McLaughlin</u>, the Ninth Circuit upheld an
automobile search as incident to arrest when the search took
place five minutes after the defendant had been arrested and
taken from the scene.  The police officer filled out impoundment
forms for the car during that five-minute gap.  <u>McLaughlin</u>, 170
F.3d at 890.  The court concluded that the "defendant's arrest,
the filling out of the impound paperwork, and the search of his
car were all part of a continuous, uninterrupted course of
events, all occurring within a relatively brief period of time."
<u>Id.</u> at 892.

      8.  Similarly, in <u>Weaver</u>, the Ninth Circuit upheld an
automobile search as contemporaneous with the arrest when the
defendant's automobile was searched ten to fifteen minutes after
the arrest in an effort to conduct a "safe search."  <u>Weaver</u>
involved a "typical procedure" of using three officers to search
a vehicle.  One officer monitored the suspects, one officer
searched the car, and one officer observed the search.  To

conduct a safe search, two arresting officers delayed the search
until a third officer arrived.  Weaver, 433 F.3d at 1105-06.  The
court concluded that the search was contemporaneous with the
arrest, as "no intervening act occurred between the arrest and
the search."  Id. at 1106.

9.   In United States v. Dento, 382 F.2d 361 (3rd Cir.
1967), the Third Circuit considered a situation similar to the
one before this court.  In Dento, police officers arrested the
defendant on Route 22 but, for reasons of safety, did not search
the car while it was parked along Route 22.  Instead, the
officers drove the defendant's car to the police station and
searched the car there, approximately twenty minutes after the
defendant's arrest.  Id. at 363.  The Third Circuit upheld the
automobile search as incident to arrest, noting that "[a]lthough
the place of the search was remote from that of the arrest, the
safety of the officers and the defendant required that the
vehicles be moved away from the flow of highway traffic."  Id. at
365.

10.   A longer delay did not destroy the
contemporaneous nature of a search in United States v. Scott, 428
F. Supp. 2d 1126, 1132 (E.D. Cal. 2006).  The United States
District Court for the Eastern District of California concluded
that a vehicle search conducted fifty minutes after the
defendant's arrest was a search incident to arrest, given the

14

safety concerns that caused the delay.  In Scott, the defendant's car had overturned in an accident and was found down an embankment.  Safety concerns posed by the vehicle's position, broken glass from the accident, and an unidentified liquid near the vehicle led the officers to wait until the car was towed up the slope and positioned upright before searching the vehicle. Id. at 1130.  Although fifty minutes passed between the defendant's arrest and the search of the car, the court upheld the search as contemporaneous with the arrest.  Id. at 1133. "When a delay in vehicle search occurs because of a safety concern for the officers on the scene, a search will not be considered remote from the time of the arrest if the search is conducted as soon as possible after the safety concern has been eliminated."  Id. at 1132.

          11.  Of course, some circumstances will cause searches not to be contemporaneous with arrests.  For example, the Ninth Circuit concluded that an automobile search was not incident to arrest when an officer spent forty-five minutes after an arrest trying to get the defendant to consent to a search of the car. United States v. Vasey, 834 F.2d 782, 787 (9th Cir. 1987). Similarly, when officers arrested the defendant, took the defendant's car and defendant to a police station, and searched the car only after deciding that the car would be towed from the station, the search was deemed not incident to the arrest.

United States v. Ramos-Osequera, 120 F.3d 1028, 1036 (9th Cir.
1997), overruled on other grounds by Apprendi v. New Jersey, 530
U.S. 466, 489-90 (2000).  In both those cases, the court noted
that the delay between arrest and search was not part of a
"continuous, uninterrupted course of events."  See McLaughlin,
170 F.3d at 892.

        12.  Whether the search of the Toyota Celica occurred
fifteen or twenty-five minutes after Kila's arrest is not
determinative of this court's ruling, as time alone is never
dispositive of the contemporaneity inquiry.  Rather, the court
focuses on whether the search was part of a continuous series of
events.

        13.  The court concludes that the search of the Toyota
Celica was contemporaneous with Kila's arrest and thus incident
to the arrest.  This case presents circumstances similar to those
in McLaughlin and Weaver.  There was no intervening event or
pause in the decisionmaking process leading to the search of the
Toyota Celica.  The delay resulted from reasonable safety
concerns.  Unlike the officers in Ramos-Osequera, the officers
here did not decide to search Kila's Toyota Celica only after
driving the vehicle to the Federal Building.  Rather, TFO Peralta
decided at the scene of the arrest that the Toyota Celica would
be searched.  He instructed TFO Worthington to drive the vehicle
to the Federal Building to ensure a safe search, away from

16

freeway traffic.  Kila's arrest, the removal of the Toyota Celica from a location that posed safety concerns, and the search of the vehicle were all part of a continuous series of events similar to the events in McLaughlin.

14. The court is not persuaded by Kila's arguments that a vehicle search could have been conducted safely at the location of the stop, or that the vehicle search should have been conducted near a closer highway exit rather than at the Federal Building.  Kila was arrested at night on a highway with "medium" traffic conditions, in an area where cars tended to pick up speed.  It was entirely reasonable to conduct the vehicle search at another location, especially because a vehicle search could reasonably require officers to open all doors and look under seats, leaving the officers physically vulnerable to highway traffic.  In addition, it was not unreasonable to conduct the search at the Federal Building rather than to pull off at a nearby exit to conduct the search in an unknown area.  As the court in Scott noted, a search is not considered remote from the arrest when the delay is caused by safety concerns.  The search of the Toyota Celica was incident to Kila's arrest.

       B.   Alternatively, The Warrantless Search of the Toyota Celica Was Supported by Probable Cause Under the Automobile Exception.

     1.  Even if the search of the Toyota Celica was not incident to Kila's arrest, the search was valid.  A warrantless search of a car is also permitted under the automobile exception to the warrant requirement under the Fourth Amendment.  If there is probable cause for believing that an automobile contains contraband, officers are entitled to search it.  Carroll v. United States, 267 U.S. 132, 153-54 (1925); see also Maryland v. Dyson, 527 U.S. 465, 467 (1999) (a finding of probable cause that a car contains contraband is sufficient to support a warrantless search, and there is no separate exigency requirement); United States v. Pinela-Hernandez, 262 F.3d 974, 978 (9th Cir. 2001) ("police may conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband").  A search is similarly permitted if there is probable cause to believe there is evidence of a crime in the automobile.  Ornelas v. United States, 517 U.S. 690, 696 (1996).

     2.  The automobile exception is grounded in two basic principles: (1) the mobility of vehicles, and (2) a reduced expectation of privacy given the pervasive regulations applicable to vehicles.  See Carney, 471 U.S. at 393; Pinela-Hernandez, 262 F.3d at 978 ("The reasons for this exception are twofold: the expectation of privacy in one's vehicle is less than in one's

home, and the mobility of vehicles necessitates faster action on
the part of law enforcement officials.").

 3.   Although the automobile exception may have
initially grown out of a concern regarding the mobility of
vehicles, the Supreme Court has been clear that mobility is not a
requirement in conducting a warrantless automobile search:

> It is thus clear that the justification to
> conduct such a warrantless search does not
> vanish once the car has been immobilized; nor
> does it depend upon a reviewing court's
> assessment of the likelihood in each
> particular case that the car would have been
> driven away, or that its contents would have
> been tampered with, during the period
> required for the police to obtain a warrant.

Michigan v. Thomas, 458 U.S. 259, 261 (1982).  See also United
States v. Henderson, 241 F.3d 638, 649 (9th Cir. 2000)
(concluding that the automobile exception applies as long as
there was probable cause to search the car, and that the
authority to search did not "evanesce" because the car had been
impounded).

 4.   Whether probable cause exists to justify a
warrantless search of an automobile must be determined at the
time of the seizure, rather than at the time of the search.  See
United States v. Trejo-Zambrano, 582 F.2d 460, 463 (9th Cir.
1978) (determination of whether probable cause exists for a
warrantless search is made at the time of the seizure, not at the
time of the search).  Once there is probable cause to seize a

car, a subsequent warrantless search of it is valid.  Henderson,
241 F.3d at 649; see also United States v. Johnson, 820 F.2d
1065, 1072 (9th Cir. 1987) (holding that once police have
lawfully seized an item, a subsequent search of that item may be
conducted without a warrant).

     5.  "There is no requirement that the warrantless
search of a vehicle occur contemporaneously with its lawful
seizure."  United States v. Johns, 469 U.S. 478, 484 (1985).  The
Supreme Court has upheld searches that have occurred numerous
days after the initial seizure when there was "probable cause to
believe that the [vehicle] contained contraband."  Id. at 387.
In Johns, the Supreme Court reversed a Ninth Circuit decision
holding that a delay in searching packages located in a vehicle
made the search of those packages unreasonable.  Id.  Because law
enforcement officials could have lawfully searched the packages
at the time they were seized from the vehicle, the Supreme Court
concluded that a three-day delay was not unreasonable and did not
violate the Fourth Amendment.  In Cooper v. California, 386 U.S.
58, 58, 61 (1967), the Supreme Court similarly held that a
warrantless search of a vehicle one week after its initial
seizure was not unreasonable.

     6.  Probable cause exists "where the known facts and
circumstances are sufficient to warrant a man of reasonable
prudence in the belief that contraband or evidence of a crime

20

will be found." Ornelas, 517 U.S. at 696.  In determining the
existence of probable cause, this court examines the totality of
the circumstances.  See Illinois v. Gates, 462 U.S. 213, 238
(1983).

   7.  In United States v. Miller, 812 F.2d 1206, 1209
(9th Cir. 1987), the Ninth Circuit concluded that there was
probable cause to search a vehicle when the police had knowledge
that the defendant was a suspected methamphetamine manufacturer,
there was a strong smell of a substance known to be used in the
production of methamphetamine coming from the car, and there was
a handgun and laboratory equipment used in methamphetamine
production in plain view in the car.  The Ninth Circuit concluded
that "[t]hese plain view, plain smell observations, added to the
[police] knowledge that [the defendant] was a suspected
methamphetamine manufacturer," established probable cause to
search the car.  Id. at 1209.

   8.  Similarly, probable cause supported the
warrantless search of Kila's Toyota Celica.  At the time of
Kila's arrest, TFO Peralta and TFO Alapa were aware of Kila's
criminal background, which included multiple drug arrests and two
prior felony drug convictions.  In addition, a grand jury had
indicted Kila for conspiracy to distribute methamphetamine.  Most
telling, however, was that the search of Kila himself revealed a
plastic bag containing what TFO Alapa believed to be

methamphetamine.  Both TFO Alapa and TFO Peralta testified that,
based on their years of experience in drug investigations,
finding drugs on an arrestee is highly indicative that drugs will
also be found in the arrestee's vehicle.  Tr. at 35, 57  Given
the totality of the circumstances, probable cause supported the
warrantless search and seizure of the Toyota Celica.

        9.  Kila says there was no probable cause to search
his car, noting that the officers were relying on a criminal
history that concerned an alleged drug conspiracy in 2005, along
with drug arrests and convictions that substantially preceded
2005.  Defendant's Reply to Government's Response to Motion to
Suppress Evidence (Mar. 13, 2008) ("Reply") at 5.  Kila's
argument fails to account for the substance that the officers
found on Kila on the night of his arrest.

        10.  Kila's reliance on United States v. Wanless, 882
F.2d 1459 (9th Cir. 1989), is unavailing.  In Wanless, the police
searched a car based on suspicions that the defendant was a drug
user.  The police had not recovered any apparent drugs from the
defendant's person before searching the car.  The court concluded
that evidence of "track marks" on the defendant's arm, the
defendant's comment that he had "shot up" two days earlier, and a
syringe cap and empty bindle found on the defendant were
insufficient to establish probable cause that the vehicle
contained contraband.  Id. at 1466.  The Wanless court

specifically noted that the police "did not detect any drug or drug-related odors, nor did they see any items that they could reasonably believe were controlled substances." Id. (internal citations omitted).  The circumstances in Kila's case are clearly analogous to those in Miller and distinguishable from those in Wanless.

          11.  The court also disagrees with Kila's contention that, once the Toyota Celica was immobilized, the officers were required to obtain a search warrant before searching it.  As the Supreme Court has made clear, the mobility of a vehicle is not a requirement for the automobile exception.  Thomas, 458 U.S. at 261.  Kila's motion to suppress evidence seized from the Toyota Celica is denied based on the automobile exception.

          C.   Inventory Search.

          Having already determined that the search of the Toyota Celia was conducted as a search incident to arrest, or, alternatively, that the search was conducted under the automobile the exception, the court need not reach the issue of whether the search of the Toyota Celica was alternatively a valid inventory search.  The court notes that an inventory search would be inconsistent with an investigatory search supported by probable cause.

D.   Probable Cause Supported the Search Warrant.

1.   Kila also challenges the search of his home,
arguing that, "[o]nce the illegally seized evidence from Mr.
Kila's automobile, and its tainted fruits, are excised from the
search warrant affidavit," there was no probable cause supporting
a search warrant.  Reply at 6.  The court has already concluded
that the search of the Toyota Celica was a search incident to
arrest or, alternatively, supported by probable cause under the
automobile exception to the warrant requirement.  Even assuming
that the search of the Toyota Celica was invalid and that
references to evidence obtained from the Toyota Celica must
therefore be redacted from the application for the search
warrant, the court concludes that the warrant of Kila's home was
supported by probable cause.

2.   A judge's issuance of a search warrant is reviewed
to determine whether "the magistrate had a substantial basis for
concluding that probable cause existed.  In doubtful cases,
preference should be given to the validity of the warrant."
United States v. Schmidt, 947 F.2d 362, 371 (9th Cir. 1991)
(internal quotation marks and citations omitted); accord United
States v. Chavez-Miranda, 306 F.3d 973, 979 (9th Cir. 2002) ("We
need only find that the issuing magistrate had a substantial
basis for finding probable cause.").  Probable cause is
determined by looking at the totality of the circumstances, and

will be found when there is "a fair probability that contraband
or evidence of a crime will be found."  United States v. Gil, 58
F.3d 1414, 1419 (9th Cir. 1995).

3.   When a search warrant relies on illegally obtained
evidence, the warrant may still be upheld if probable cause
exists without inclusion of the tainted evidence.  United States
v. Giordano, 416 U.S. 505, 555 (1974) ("[T]he inclusion of
indisputably tainted allegations does not necessarily render the
resulting warrant invalid.  The ultimate inquiry on a motion to
suppress evidence seized pursuant to a warrant is not whether the
underlying affidavit contained allegations based on illegally
obtained evidence, but whether, putting aside all tainted
allegations, the independent and lawful information stated in the
affidavit suffices to show probable cause."); see also United
States v. Driver, 776 F.2d 807, 812 (9th Cir. 1985).

4.   Even excluding the evidence obtained from the
search of Kila's Toyota Celica, Magistrate Judge Kurren had a
"substantial basis" for determining that evidence relating to the
alleged methamphetamine conspiracy would be found at Kila's home.
The application for the search warrant included a thirty-three-
page affidavit describing a twenty-seven-month investigation of a
methamphetamine conspiracy in which methamphetamine was purchased
from distributors in Las Vegas, Nevada, to be sold in Hawaii.
The affidavit set forth the accounts of numerous cooperating

25

defendants who had personally sold large amounts of methamphetamine to Kila over a five-year period.  See Ex. 9 at 18, 27-29.  Kila allegedly received the methamphetamine by sending someone to Las Vegas to retrieve it and by directing shipments to an office building located in Honolulu, Hawaii.  Id. at 26-27.  One of the cooperating defendants identified Kila from a photographic lineup.  Id. at 29.  Based on TFO Peralta's experience and training, he believed that it was a "common practice for drug traffickers to store their drug inventory and drug-related paraphernalia" and records concerning their drug trafficking in their residences.  Id. at 3.  Less than two full pages in the application described the items recovered from Kila's Toyota Celica.  Even excluding evidence recovered from the Toyota Celica, there was a substantial basis for the Magistrate Judge to determine that probable cause supported the issuance of the search warrant for Kila's home.

> E.   Alternatively, The Good-Faith Exception Supports the Search of Kila's Home.

1. Even if the warrant authorizing the search of Kila's residence was not supported by probable cause after the evidence seized from the Toyota Celica is excluded, the search of Kila's home was sustainable under the good-faith exception set forth in United States v. Leon, 468 U.S. 897 (1984).  "[P]hysical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the

conclusion that such evidence should be admissible in the prosecution's case in chief." Id. at 912; see also United States v. Hendricks, 743 F.2d 653, 656 (9th Cir. 1984) (holding that "evidence should not be suppressed if the officers' reliance on the warrant was reasonable").

2.   The officers searched Kila's residence only after first obtaining a search warrant from Magistrate Judge Kurren. Although the good-faith exception is inapplicable when the searching officer introduces the tainted evidence in an effort to obtain a search warrant, see Vasey, 834 F.2d at 789, no evidence was submitted to this court suggesting that TFO Peralta had any reason to doubt the validity of the search of the Toyota Celica. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." Leon, 468 U.S. at 920.  Even if the search warrant was deficient in some respect, the officers relied on the warrant in good faith, and their search of Kila's residence pursuant to a search warrant falls under Leon's good-faith exception.

F.  Miranda Warnings Were Required Because Kila Was
    Subjected to Custodial Interrogation.

1.  Miranda warnings are required whenever a person is subject to custodial interrogation.  Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably

27

likely to elicit an incriminating response from the suspect."
Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  An
incriminating response is "any response--whether inculpatory or
exculpatory--that the prosecution may seek to introduce at
trial."  Id. at n.5; see also Miranda v. Arizona, 384 U.S. 436,
476-77 (1966) (clarifying that statements introduced by the
prosecution solely for impeachment purposes are incriminating).

　　　　2.  Whether custodial questioning constitutes
custodial interrogation is an objective inquiry, and the
subjective intent of the police, though relevant, is not
conclusive.  The focus is on the defendant's perceptions.  Innis,
446 U.S. at 301.  Thus, the fact that a question is objective, or
was not "asked in an attempt to elicit evidence of crime," is
insufficient for finding that the questioning is not an
interrogation.  United States v. Booth, 669 F.2d 1231, 1238 (9th
Cir. 1981).  "Even a relatively innocuous question may, in light
of the unusual susceptibility of a particular subject, be
reasonably likely to elicit an incriminating response."  Id.
(citing Innis, 446 U.S. at 302 n.8); see also United States v.
Henley, 984 F.2d 1040, 1042 (9th Cir. 1993)("When a police
officer has reason to know that a suspect's answer may
incriminate him, however, even routine questioning may amount to
interrogation.").

3.   In <u>United States v. Padilla</u>, 387 F.3d 1087, 1093 (9th Cir. 2004), the Ninth Circuit concluded that a federal agent's statement "to the effect" that it was defendant's "last chance to cooperate" constituted interrogation because "the agent should have known that it was reasonably likely that such a comment would evoke an incriminating response."  <u>Id.</u>

4.   Similarly, in <u>Henley</u>, the Ninth Circuit concluded that a fairly innocuous question constituted interrogation given the context of the questioning and the content of the question. Specifically, when the police officer investigating a bank robbery asked the defendant whether he was the owner of the getaway car, the police officer was "reasonably likely to elicit an incriminating answer."  <u>Id.</u> at 1043; <u>see also</u> <u>Booth</u>, 669 F.2d at 1238 (routine questions regarding whether the defendant had a prior arrest record and defendant's reason for being in the area constituted interrogation under the circumstances).

5.   The Government does not dispute that Kila was in custody, arguing only that Kila was not subject to custodial interrogation.  United States of America's Amended Response and Opposition to Defendant Kila's Motion to Suppress Evidence (Mar. 10, 2008) ("Amended Opp'n") at 2.  The Government claims that because TFO Peralta's questioning was not designed to elicit an incriminating response, Kila was not subjected to custodial interrogation.  The court disagrees.

6.   TFO Peralta's subjective intent is not dispositive in this court's analysis, as the court is primarily concerned with whether the questioning was reasonably likely to elicit an incriminating response from Kila.  Although TFO Peralta claims to have only been looking for a "yes" or "no" response from Kila, the circumstances of the situation may have made Kila especially susceptible to giving an incriminating response.  Kila had just been arrested and placed in handcuffs, and he was being asked whether he wanted to cooperate in the investigation of a drug conspiracy that he was being arrested for and for which he was told he could be sentenced to life in prison.  The court finds the questioning in this case similar to that in Padilla, in which the Ninth Circuit noted that, with regard to the Government statements, "It is difficult to imagine any purpose fo such a statement other than to elicit a[n incriminating] response." Padilla, 387 F.3d at 1093.  Given the circumstances of the questioning, the court similarly concludes that the questions and statements made by TFO Peralta were likely to elicit an incriminating response from Kila.  Because Kila was subjected to custodial interrogation without being advised of his Miranda rights, Kila's post-arrest statements are suppressed.

IV.      CONCLUSION.

For the foregoing reasons, Kila's motion to suppress is granted in part and denied in part.  The court suppresses Kila's

post-arrest statements, but declines to suppress the evidence
recovered from the search of the Toyota Celica or Kila's
residence.  This order also disposes of the Government's separate
motion regarding use of what it refers to as "Rule 404(b)"
evidence concerning Kila.  As the purported "Rule 404(b)
evidence" is the evidence at issue on the present motion to
suppress, that "Rule 404(b) evidence" is not inadmissible at
trial.

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, May 8, 2008.




        /s/ Susan Oki Mollway
        Susan Oki Mollway
        United States District Judge



**United States v. Wayne Kila**; CR. No. 07-00615 (07) SOM; ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT WAYNE KILA'S MOTION TO SUPPRESS.